O

# United States District Court
# Central District of California

| | |
|---|---|
| CALIFORNIA INSURANCE GUARANTEE ASSOCIATION,<br><br>        Plaintiff,<br><br>   v.<br><br>SYLVIA MATHEWS BURWELL; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; and CENTER FOR MEDICARE & MEDICAID SERVICES,<br><br>        Defendants. | Case № 2:15-cv-01113-ODW (FFMx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND [55]** |

## I.   INTRODUCTION

This is an action for declaratory and injunctive relief filed by Plaintiff California Insurance Guarantee Association ("CIGA") against Defendants Sylvia Mathews Burwell, United States Department of Health & Human Services, and Center for Medicare & Medicaid Services (collectively "United States"). CIGA seeks a judicial declaration that it is not required to reimburse the United States for Medicare benefits paid to individuals whose losses may also be covered by insurance plans that CIGA administers. CIGA now moves for leave to file a Third Amended Complaint to add what it characterizes as a new theory of relief and a request for new injunctive relief. But because CIGA knew of the facts underlying its new allegations long before

it filed this Motion, the Court concludes that it has not shown "good cause" to amend the complaint after the deadline set forth in the scheduling order. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992). Thus, the Court **DENIES** CIGA's Motion.[1] (ECF No. 55.)

## II. BACKGROUND

### A. Factual Background

CIGA is a statutorily-created and unincorporated association of insurers admitted to transact certain classes of insurance business in California. (Second Am. Compl. ("SAC") ¶ 6.) CIGA was created by the California Legislature to establish a fund from which insureds could obtain financial and legal assistance in the event their insurers became insolvent. (*Id.* ¶ 10.) To that end, CIGA is generally required to pay claims covered under policies issued by insolvent insurers, subject to certain statutory limitations and exceptions. (*Id.*)

CIGA is currently paying claims under three workers' compensation policies issued by now-insolvent insurers. (*Id.* ¶ 21.) These claimants also received Medicare benefits. (*Id.*) Where Medicare pays benefits for a loss that is also covered by another insurance plan, the Medicare Secondary Payer statute, 42 U.S.C. § 1395y ("MSP"), generally requires those other plans (called "primary plans") to reimburse Medicare for the benefits it paid. (*Id.* ¶ 18.) Concluding that the workers' compensation plans at issue were "primary plans" that covered at least some of the losses for which it paid benefits, Medicare demanded reimbursement from CIGA. (*Id.* ¶ 22.) CIGA refused, prompting Medicare to refer the matters to collection. (*Id.* ¶¶ 22–25.)

### B. The Pleadings

CIGA originally filed this action on February 17, 2015, and filed a First Amended Complaint ("FAC") on March 18, 2015. (ECF Nos. 2, 17.) In its FAC, CIGA alleged that it was not required to reimburse Medicare because (1) workers'

---

[1] After considering the papers filed by the parties, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

compensation plans are not "primary plans" under the MSP when administered by CIGA, (2) certain California statutes prohibit CIGA from reimbursing Medicare, and (3) some of the workers' compensation policies at issue did not in fact cover the losses for which Medicare paid benefits. (ECF No. 17.) The United States moved to dismiss all three theories. (ECF No. 24.) The Honorable Margaret M. Morrow granted the Motion as to the first and second theory, but denied the Motion as to the third theory. (ECF No. 38.) Judge Morrow also granted CIGA leave to amend to assert additional grounds on which Medicare is prohibited from seeking reimbursement.[2] (*Id.*) On November 23, 2015, CIGA filed a Second Amended Complaint ("SAC"), in which it added the following two grounds: (1) the United States did not file timely proofs of claim under the California Guarantee Act, and (2) the Guarantee Act prohibits the United States from asserting claims against CIGA as either an assignee or subrogee of the insured (or the insurer).[3] (ECF No. 41.) Upon motion by the United States, this Court dismissed both theories without leave to amend, leaving only CIGA's original theory that the policies it was administering did not cover the relevant losses. (ECF No. 50; SAC ¶¶ 46–53.) The United States answered CIGA's SAC thereafter. (ECF No. 51.)

**C.    Discovery**

On September 14, 2015, Judge Morrow issued the scheduling order for this matter, which set October 13, 2015, as the last day for the parties to move to amend the pleadings.[4] (ECF No. 33.) In December 2015, the United States produced its MSP Manual in response to CIGA's document requests. (Young Decl. ¶ 7, Ex. 5, ECF No. 59-1.) The MSP Manual states, in relevant part: "If [a workers'

---

[2] The matter was transferred to this Court soon thereafter. (ECF No. 43.)

[3] It also amended the undismissed theory to include the specific medical diagnostic codes that were allegedly not covered by the workers' compensation policies at issue, but for which Medicare was nevertheless seeking reimbursement. (SAC ¶¶ 46–53.)

[4] On January 5, 2016, after the case was transferred to the undersigned, the Court vacated all future dates and deadlines set by Judge Morrow and issued a new scheduling order. (ECF Nos. 44, 45.) The deadline to amend the pleadings had long passed by then, and thus was left unchanged.

compensation policy] does not pay all of the charges because only a portion of the services is compensable, i.e., the patient received services for a condition which was not work related concurrently with services which were work-related, Medicare benefits may be paid to the extent that the services are not covered by any other source which is primary to Medicare." (Young Decl., Ex. D at 45, ECF No. 55-1.)

At some point, CIGA produced to the United States the claim file for one of the workers' compensation policies at issue in this lawsuit. The file included a note from February 25, 2013, stating, "review of codes shows that only a few are actually asbestos related[.] [S]ome simply note the asbestos code but are not the driving code for the treatment." (Opp'n, Ex. A at C002414–15, ECF No. 58-1.) There is also a note from June 12, 2013, stating, "[a]nother issue is that only approx. $338.98 of the claimed conditional payments are related to asbestos. The $300+ potential related treatment are [sic] based on there being one single code for asbestosis submitted to CMS." (*Id.* at C002405.) Another note from June 2014 noted that "[t]he relatedness of the treatment rendered on the conditional payments remains in dispute. CIGA only found $338.98 worth of treatment that is potentially related to asbestos or pulmonary conditional [sic] that is industrial. However, CMS has refused to amend the conditional payments to reflect this change." (*Id.* at C002398.) There are numerous other notes from 2013 and 2014 to the same effect, some of which also state that CIGA intended to use this file as a "test case" for its legal defenses. (*See generally* Opp'n, Ex. A.)

On April 13, 2016, CIGA took the deposition of Ian Fraser, who is a Health Insurance Specialist with the Medicare Secondary Payer Unit. (Young Decl. ¶ 10, Ex. 3, ECF No. 59-1.) During his deposition, Fraser testified that Medicare often pays medical bills that contain a single charge for services rendered under multiple medical diagnostic codes, and that there is no practical way for Medicare to apportion the charge among the various codes. (Fraser Depo., 33–36, Decl. Young, Ex. C, ECF No. 55-1.) In such cases, Medicare determines if any one of the diagnostic codes relate to

losses that are covered by other potential primary plans. (*Id.*) If so, Medicare seeks reimbursement from that plan for the *entire* charge, notwithstanding the fact that some unsegregated portion of the bill is for medical services that it knows is not covered by the plan. (*Id.*) Fraser appeared to acknowledge that this practice conflicts with the MSP Manual. (*Id.*)

Based on this testimony, CIGA moved for leave to amend to add allegations regarding Medicare's practice of seeking reimbursement for medical expenses that it knows are not covered by the plans, in deliberate violation of the MSP Manual. (Proposed Third Am. Compl. ("Proposed TAC") ¶¶ 54–67, Young Decl. ¶ 13, Ex. 11, ECF No. 59-1.) CIGA also seeks to add a request to permanently enjoin Medicare from seeking reimbursement from CIGA for "charges . . . that are not covered by the workers compensation insurance policy of any insolvent insurer." (*Id.* at 78–79.)[5] The United States opposed, and CIGA replied. (ECF Nos. 58, 59.) That Motion is now before the Court for consideration.

### III. LEGAL STANDARD

When a party moves to amend a pleading beyond the deadline set in the scheduling order, it must first show "good cause" for relief from the deadline. Fed. R. Civ. P. 16(b)(4); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992). "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* at 609. "[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply

---

[5] CIGA also included in its Proposed TAC additional uncovered medical diagnostic codes that were disclosed during discovery. (Proposed TAC ¶¶ 50, 52.) The United States argues that CIGA has not shown good cause for these changes. (Opp'n 2–3.) CIGA responds that they are not substantive additions to the pleadings, but rather are intended to more fully plead pre-existing theories. (Reply 11–12.) CIGA even offers to withdraw the proposed changes given that, according to CIGA, they are already encompassed by the allegations in the SAC. (*Id.*) The Court agrees that the additional codes are fairly included in the allegations in the SAC, and thus denies as moot CIGA's request for leave to add those codes.

additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end." *Id.* (citations omitted).

"The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013), *aff'd on other grounds sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). Similarly, a party does not show good cause where it does not conduct basic investigation into the circumstances underlying its claims until after the deadline to amend has passed. *Hernandez v. Select Portfolio Servicing, Inc.*, No. CV 15-1896 PA (AJWX), 2016 WL 770869, at *3 (C.D. Cal. Feb. 24, 2016); *Bonneau v. SAP Am., Inc.*, No. C 03-5516 PJH, 2004 WL 2714406, at *1 (N.D. Cal. Nov. 29, 2004). Finally, "a district court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint.'" *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994) (quoting *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987)).

If the party establishes good cause, it must then show that the proposed amendment is proper under Federal Rule of Civil Procedure 15. *See Johnson*, 975 F.2d at 608 (citing *Forstmann v. Culp,* 114 F.R.D. 83, 85 (M.D.N.C. 1987)). Under Rule 15, "[f]our factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment." *Leighton*, 833 F.2d at 186 (citations omitted). While the Rule 15 factors should be analyzed with "extreme liberality" toward favoring amendments, *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981), the moving party cannot "appeal to the liberal amendment procedures afforded by Rule 15" unless it first "satisf[ies] the *more stringent* 'good cause' showing required under Rule 16." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006)

(original emphasis).

## IV. DISCUSSION

CIGA concedes that it knew long before it filed this action that Medicare sought reimbursement for charges relating to codes that CIGA believed were not covered under the policies; indeed, it was one of the original bases on which it brought this action. (Reply 4–5 (citing FAC ¶¶ 31–37).) CIGA argues, however, that it previously assumed either that this was a simple "accident" by Medicare, or that it was "part of a good faith dispute over whether the charges were covered by the policies." (*Id.* at 5.) According to CIGA, it learned only during Fraser's deposition that (1) the reimbursement demands reflected a *deliberate* practice of billing CIGA for diagnostic codes that Medicare knew was not covered by the relevant policies, and that (2) Medicare knew this practice was contrary to the procedures outlined in the MSP Manual. (*Id.* at 5–6.) Because it moved for leave to amend immediately after receiving Fraser's deposition transcript, CIGA argues that it was diligent in seeking leave to amend.

The Court is unpersuaded. The 2013 and 2014 notes in CIGA's claim file belie any argument that it believed this was a simple billing error, or that it understood Medicare to be taking the position that *all* of the diagnostic codes relating to the charges were covered under the workers' compensation policies. (*E.g.*, Opp'n, Ex. A at C002405 ("Another issue is that only approx. $338.98 of the claimed conditional payments are related to asbestos. The $300+ potential related treatment are [sic] based on there being one single code for asbestosis submitted to CMS.").) To the contrary, the notes make clear that CIGA understood Medicare to be affirmatively taking the position that it could seek reimbursement for charges where only "one single code" related to covered services.[6] (*Id.*) And even if CIGA was in fact unclear

---

[6] Moreover, given that the United States litigated this issue for over a year before Fraser's deposition, it strains credulity for CIGA to argue that it believed up until his deposition that this was all the product of a simple billing error.

1 on Medicare's exact position, a reasonably diligent attorney would have sought
2 clarification from the United States at some point during the year that this matter has
3 been pending, whether through informal discussions with counsel or through written
4 discovery. As such, Medicare's position was either known by or reasonably available
5 to CIGA long before Fraser's deposition.

6 Moreover, the fact that Medicare was deliberately disregarding the MSP
7 Manual does not warrant amending the complaint. First, this fact is already fairly
8 encompassed by the allegations in the operative complaint. That is, CIGA alleges in
9 the SAC that Medicare's practice of seeking reimbursement for diagnostic codes that
10 relate to losses not covered by the policies is arbitrary, capricious, and contrary to law.
11 (SAC ¶¶ 45–53, 65, 77, 78.) To the extent that the knowing violation of the MSP
12 Manual is relevant to the lawfulness of Medicare's practice, the allegations in the SAC
13 fairly include such evidence. In other words, there is no suggestion that this newly-
14 uncovered evidence could not be used to demonstrate liability absent an amendment to
15 the complaint.[7]

16 Second, CIGA could have requested its newly-proposed injunctive relief long
17 before it discovered that Medicare's practice violates the MSP Manual. Agency
18 manuals "lack the force of law," *Christensen v. Harris County*, 529 U.S. 576, 587
19 (2000), and thus the fact that Medicare's practice violates the MSP Manual does not
20 create liability where there was none before. As a result, CIGA's discovery of this
21 fact during Fraser's deposition does not justify its belated attempt to add new theories
22 or seek new injunctive relief. CIGA could have and should have requested this relief
23 when it *first* alleged that Medicare's practice was arbitrary, capricious, and contrary to
24 law. (FAC ¶ 33, 48–51; SAC ¶¶ 45–53, 65, 77, 78.) *W. States Wholesale Nat. Gas*

---

[7] The Court recognizes that the United States previously took the position that judicial review is limited to the administrative record. (*See* Joint Report at 3–4, ECF No. 31.) It is unclear whether this issue has since been resolved, but regardless, amending the complaint to include facts uncovered in discovery would not change the law regarding the proper scope of judicial review.

*Antitrust Litig.*, 715 F.3d at 737 ("The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action.").

### V. CONCLUSION

For the reasons discussed above, the Court finds that CIGA did not act with diligence, and thus has not shown good cause to amend its complaint after the deadline set forth in the scheduling order. Fed. R. Civ. P. 16(b)(4); *Johnson*, 975 F.2d at 607 ("If th[e] party [seeking leave to amend] was not diligent, the inquiry should end."). Consequently, the Court **DENIES** the CIGA's Motion. (ECF No. 55.)

**IT IS SO ORDERED.**

June 14, 2016

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**