O

# United States District Court
# Central District of California

| | |
|---|---|
| CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, | Case № 2:15-cv-01113-ODW (FFMx) |
| Plaintiff, | **ORDER ON MOTION TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT [63, 68, 87]** |
| v. | |
| SYLVIA MATHEWS BURWELL, Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; and CENTER FOR MEDICARE & MEDICAID SERVICES, | |
| Defendants. | |

## I.   INTRODUCTION

This is an action for judicial review of Medicare reimbursement demands. At various times, the Center for Medicare and Medicaid Services ("CMS")—which administers the federal Medicare program and the Medicare Secondary Payer statute, 42 U.S.C. § 1395y ("MSP")—paid health benefits to three individuals. These individuals were also insured under several workers' compensation policies administered by the California Insurance Guarantee Association ("CIGA"). Because Medicare benefits are always secondary to any other applicable insurance, CMS sought reimbursement from CIGA for some of the benefits paid. CIGA alleges,

however, that CMS calculated its reimbursement liability in a manner that is contrary to the MSP and the implementing regulations, resulting in over-inclusive reimbursement demands.  CIGA seeks a judicial declaration to that effect, as well as a permanent injunction barring CMS from reapplying the offending practice to future demands against CIGA.  Defendants raise a litany of defenses to this action, including that: (1) CIGA's claims are moot because CMS recently ceased efforts to collect on the three reimbursement demands at issue; (2) CIGA did not make a *prima facie* case that CMS's demands were over-inclusive; (3) CMS's practice is in any event based on a reasonable interpretation of the MSP and the implementing regulations; (4) CIGA did not adequately plead its request for injunctive relief; (5) an injunction affecting future reimbursement demands effectively (and impermissibly) bypasses the mandatory administrative appeals process; and (6) directing CMS not to use a particular method to calculate reimbursement liability constitutes an impermissible "programmatic attack" on Medicare.

Defendants have moved for summary judgment, and CIGA has moved for partial summary judgment.  Defendants have also moved to dismiss the action as moot.  For the reasons discussed below, the Court rejects each and every argument Defendants advance, and concludes that Defendants' interpretation of the MSP and the relevant regulations are contrary to law and not entitled to deference.  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss (ECF No. 87),[1] **DENIES** Defendants' Motion for Summary Judgment (ECF No. 63), and **GRANTS** CIGA's Motion for Partial Summary Judgment (ECF No. 68).

## II.   BACKGROUND

### A.   Factual Background

CIGA is a statutorily-created association of insurers admitted to transact certain classes of insurance business in California.  Cal. Ins. Code § 1063(a).  CIGA provides

---

[1] After considering the papers filed in connection with this Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

a fund from which insureds can obtain financial and legal assistance in the event their insurers become insolvent.  *Id.*  To that end, CIGA is generally required to pay insurance claims that are covered under policies issued by insolvent insurers, subject to certain statutory limitations and exceptions.  *See generally id.* § 1063.2.

Medicare is a health insurance program run by the federal government that provides benefits to elderly people and people with certain types of disabilities.  *See generally* 42 U.S.C. §§ 1395 et seq.  Where Medicare pays benefits for a loss that is covered under another insurance plan, however, the MSP requires those other plans (called "primary plans") to reimburse Medicare.   42 U.S.C. § 1395y(b)(2)(A)(ii), (B)(ii).   To determine whether a potential primary plan covers a particular medical charge, CMS looks to the medical diagnosis code recorded by the provider for that charge.  These codes are commonly used in the medical billing industry to indicate the condition treated and/or procedure used.  (Defs.' SUF 7, 9, ECF No. 75-1; Pl.'s SUF 41, 42, ECF No. 76-1.)  It is not uncommon, though, for multiple diagnosis codes to appear under a single charge—some of which relate to a medical condition covered by the primary plan, and some of which do not.  In those instances, CMS determines if any one code relates to a covered condition.  (Pl.'s SUF 43; Defs.' SUF 9.)  If so, CMS seeks reimbursement for the full amount of the charge, even if some unsegregated portion of the charge is for medical services *not* covered by the plan. (Pl.'s SUF 44–46; Defs.' SUF 9.)

Here, CIGA informed CMS that it was paying certain medical costs for three people under three separate workers' compensation policies.  (Defs.' SUF 5.)  CMS determined that it had also paid benefits to those people, and thus sent conditional payment letters to CIGA seeking full reimbursement for each charge containing at least one covered diagnosis code—even though many charges also contained codes that were indisputably not covered.  (Defs.' SUF 5; Pl.'s SUF 2–4, 6, 9, 15, 25, 26.) For example, under Claim No. 108-7200001951 ("Claim 1"), CIGA's policy covered medical costs incurred by a worker as a result of a slip and fall accident that caused

back and leg injuries. (Pl.'s SUF 5.) Although each charge for which CMS sought reimbursement contained at least one diagnosis code related to this injury, several charges also contained codes relating to diabetes, insulin use, and bereavement. (Pl.'s SUF 5–11.) Likewise, under Claim No. 113-OSB80012157 ("Claim 2"), CIGA was paying for medical costs incurred by a worker after he stepped into a hole and injured his left knee, left hip, and spine; yet CMS sought full reimbursement for charges that also contained codes relating to high blood pressure, bronchitis, tobacco use, and eczema. (Pl.'s SUF 14–21.) Finally, under Claim No. 113-9500002572 ("Claim 3"), CIGA was paying for medical costs incurred by a worker for asbestos exposure, but CMS sought reimbursement for charges that also contained codes relating to stomach ulcers, dizziness, and giddiness. (Pl.'s SUF 24–30.) CIGA responded to CMS's letters by raising a host of defenses, including that numerous charges contained diagnosis codes that its policies did not cover. (Pl.'s SUF 12–13, 22–23, 32–33; Defs.' SUF 8.) CMS nevertheless issued a formal demand letter for the full amount of each charge. (*See* Pl.'s SUF 66.) This lawsuit soon followed.[2]

**B.   The Pleadings**

**1.   First Amended Complaint**

In its First Amended Complaint ("FAC"), CIGA asserted several theories that broadly challenged CMS's ability to seek *any* reimbursement from CIGA.[3] (FAC ¶ 29.) First, CIGA alleged that workers' compensation plans are not "primary plans"

---

[2] At the time this dispute arose, there was no administrative appeals process in place to challenge final reimbursement determinations against primary payers. Thus, as Defendants concede, the issuance of a formal demand letter to the primary payer constitutes "final agency action" that is subject to judicial review. *See Haro v. Sebelius*, 747 F.3d 1099, 1114 (9th Cir. 2014). CMS has since passed regulations requiring that such reimbursement disputes go through the same appeals process as Medicare benefit determinations. *See generally* Medicare Program; Right of Appeal for Medicare Secondary Payer Determinations Relating to Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation Laws and Plans, 80 Fed. Reg. 10,611-01 (Feb. 27, 2015) (codified in scattered sections of 42 C.F.R. § 405).

[3] CIGA brings these challenges using the following procedural vehicles: (1) the Administrative Procedure Act, 5 U.S.C. § 702; (2) the Medicare Act, 42 U.S.C. § 1395ii; and (3) the Declaratory Judgment Act, 28 U.S.C. § 2201. (ECF No. 40.)

under the MSP when administered by CIGA.  (*Id.* ¶ 28.)  Next, CIGA alleged that it can pay only statutorily-defined "covered claims," Cal. Ins. Code § 1063.2, and that the statutory definition excludes (1) obligations to the federal government, *id.* § 1063.1(c)(4), and (2) any claims that are not "within the coverage of an insurance policy of the insolvent insurer," *id.* § 1063.1(c)(1)(A).  (FAC ¶¶ 27, 32.)  Finally, CIGA asserted that it was obligated to pay claims only if they arose after the date of the issuing-insurer's insolvency, and that CMS made many of the benefit payments before that date.  (*Id.* ¶ 35.)  CIGA sought declaratory and injunctive relief, including "an order permanently enjoining Defendants . . . from enforcing the MSP provisions against CIGA with respect to government claims for reimbursement that are not 'covered claims.'"  (FAC, Prayer for Relief ¶ 4.)

Defendants moved to dismiss the FAC.  (ECF No. 24.)  The Court held that CIGA-administered insurance plans constitute "primary plans" within the meaning of the MSP, and that the MSP preempted the California Guaranty Act's prohibition on paying obligations to the federal government.  (Order at 17, ECF No. 38.)  However, the Court determined that CIGA had stated a plausible claim to the extent CMS sought reimbursement for claims that were not "within the coverage of an insurance policy of the insolvent insurer."  (*Id.* at 25.)  Finally, the Court held that CIGA did not plead sufficient facts in support of its remaining claims and theories, which the Court dismissed with leave to amend.  (*Id.*)

**2.    Second Amended Complaint**

In its Second Amended Complaint ("SAC"), CIGA reasserted its theory that CMS was improperly seeking reimbursement for charges that did not fall "within the coverage of an insurance policy of the insolvent insurer."  (SAC ¶¶ 43–47, 48–52, ECF No. 40.)  But CIGA also alleged two new theories: that the payments at issue were not "covered claim[s]" because (1) CMS did not file timely proofs of claim in the defunct insurer's insolvency proceedings, and (2) CMS was impermissibly asserting claims as an assignee or subrogee of the insured.  (*Id.* ¶¶ 26–42.)  The prayer

for relief in the SAC was identical to the prayer in the FAC.  (*Id.*, Prayer for Relief ¶¶ 1–5.)  Upon motion by Defendants, the Court dismissed the new theories without leave to amend.  (ECF No. 50.)  This left only CIGA's original theory that the policies it administered did not cover all of the losses for which CMS sought reimbursement.  Defendants answered CIGA's SAC thereafter.  (ECF No. 51.)

### 3.    Proposed Third Amended Complaint

In May 2016, CIGA moved for leave to file a Third Amended Complaint to add, among other things, a request to permanently enjoin Defendants from seeking reimbursement from CIGA for "charges . . . that are not covered by the workers compensation insurance policy of any insolvent insurer."  (ECF No. 55.)  The Court denied the motion, holding that such relief could and should have been pleaded in prior iterations of its complaint.  (Order at 8, ECF No. 61.)

## C.    Pending Motions

In June 2016, CIGA moved for partial summary judgment on its APA claim, and Defendants moved for summary judgment on the entire action.  (ECF Nos. 63, 68.)  At the hearing on the motions, the Court expressed deep skepticism with Defendants' interpretation of the MSP.  (ECF No. 79, 81.)  The Court ultimately took both motions under submission and ordered the parties to mediate further.  (*Id.*)  Four weeks later, the parties submitted a joint report stating that they were unable to reach a settlement.  (ECF No. 87.)  Defendants also indicated, however, that they had since recalculated CIGA's liability for the disputed charges based on their "discussions with CIGA," and that the "total recalculated amount was substantially lower than that of the original demands."  (*Id.* at 5.)  Defendants thus decided to withdraw those demands. (*Id.*)  Defendants argued that this rendered the action moot, and that "[a]ny new demands [for payment] would be based on the recalculated amounts, [which] would be subject to a full administrative appeals process as provided by Medicare regulation."  (*Id.* at 5–6.)  Defendants requested leave to move to dismiss the action as moot, which the Court granted.  (ECF No. 84.)

The parties' summary judgment motions, as well as Defendants' motion to dismiss, are now before the Court for decision.

### III.   MOTION TO DISMISS

Defendants argue that because CMS will no longer seek reimbursement for the payments allegedly owed under the three claims, this action is moot and must be dismissed.  (Defs.' Mot. to Dismiss at 6–7, ECF No. 87; Defs.' Reply at 2–5, ECF No. 89.)  CIGA responds that Defendants' conduct does not make it "absolutely clear" that CMS will never again reopen these claims or reapply the offending practice, which means the case is not moot.  (Pl.'s Opp'n at 3–6, ECF No. 88.)  The Court agrees with CIGA that no part of the case is moot.[4]

"[A] case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted).   The Supreme Court "ha[s] recognized, however, that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.  Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (citations omitted).  Accordingly, voluntary cessation moots a claim only where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted); *see also Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (a case is not moot if the court can grant "*any* effective relief").  The party asserting mootness bears the "heavy burden" of meeting this standard.  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

---

[4] The Court addresses Defendants' arguments regarding the propriety of injunctive relief in Section IV.C.

Here, the government clearly has not met that burden.  Defendants have not changed their practice with respect to reimbursement calculations; rather, they have simply withdrawn their reimbursement demands for the three particular claims at issue in this lawsuit.  "'[T]he government cannot escape the pitfalls of litigation by simply giving in to a plaintiff's individual claim without renouncing the challenged policy, at least where there is a reasonable chance of the dispute arising again between the government and the same plaintiff.'"  *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1175 (9th Cir. 2009) (quoting *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 74 F.3d 1308, 1311 (D.C. Cir. 1996)).  Indeed, given the timing of the withdrawals (i.e., immediately after a hearing in which the Court made clear that CMS's practice would not withstand scrutiny), it seems obvious that this is simply a strategic maneuver designed to head off an adverse decision so that CMS can continue its practice in the future.[5]  *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("The SEIU argues that we should dismiss this case as moot.  In opposing the petition for certiorari, the SEIU defended the decision below on the merits.  After certiorari was granted, however, the union sent out a notice offering a full refund to all class members, and the union then promptly moved for dismissal of the case on the ground of mootness.  Such postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye. . . . [Moreover], since the union continues to defend the legality of the Political Fight–Back fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future. . . . For this reason, we conclude that a live controversy remains . . . .").  Thus, neither the claim for declaratory relief as to the three reimbursements demands, nor the request for injunctive relief as to future reimbursement calculations, are moot.  *See also*

---

[5] This also rebuts any presumption that the government was acting in good faith in withdrawing the payment demands.  *Rosebrock*, 745 F.3d at 972; *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010).

*Rosemere*, 581 F.3d at 1173 (in an action to compel EPA to adjudicate plaintiff's outstanding administrative claim and for an injunction requiring EPA to timely adjudicate plaintiff's future claims, EPA's adjudication of the outstanding claim did not moot the request for injunctive relief because the government did not show it was "absolutely clear" that future administrative claims by plaintiff would be timely adjudicated).

## IV.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

#### 1.   Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).

The district court "is not required to resolve any facts in a review of an administrative proceeding"; rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).  As a result, summary judgment is an appropriate vehicle for deciding such cases. *Id.*

#### 2.   Standard of Review

When a party seeks judicial review of agency action under the APA, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).[6]   Under the APA, questions of statutory interpretation are addressed under the *Chevron* and *Skidmore* framework, and questions of regulatory interpretation under *Auer*.

### i.   *Chevron* Deference

Courts review an agency's construction of a statute that it administers using a two-step test.   "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013) (citations omitted). "But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.*

While administrative regulations are the classic vehicle for an agency's interpretation of a statute, deference is not foreclosed to interpretations contained in other mediums.   Rather, the Court must analyze "the form and context" in which the interpretation arose.   *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 826 (9th Cir. 2012) (en banc); *United States v. Mead Corp.*, 53 U.S. 218, 226–27 (2001).   The Ninth Circuit has taken a very skeptical approach to statutory interpretations advanced only during litigation or in the government's briefs.   *Price*, 697 F.3d at 825–32; *Andersen v. DHL Ret. Pension Plan*, 766 F.3d 1205, 1212 (9th Cir. 2014) ("[T]he government's brief here is not entitled to deference pursuant to *Chevron* insofar as it interprets the statutory text directly.").

---

[6] CIGA does not move for summary judgment on its claims under the Medicare Act or the Declaratory Judgment Act.   Defendants also do not address those claims, even though they move for summary judgment on CIGA's entire lawsuit.   Because of this, Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on those claims.

### ii.    *Skidmore* Deference

"Where *Chevron* is inapplicable, reasonable agency interpretations may still carry 'at least some added persuasive force.'" *Price*, 697 F.3d at 832 (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997)).  Under *Skidmore*, "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Mead Corp.*, 533 U.S. at 234 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  "Under this level of review, [the court] look[s] to the process the agency used to arrive at its decision.  Among the factors [the court] consider[s] are the interpretation's thoroughness, rational validity, consistency with prior and subsequent pronouncements, the logic and expertness of an agency decision, the care used in reaching the decision, as well as the formality of the process used." *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citations, internal quotation marks, and brackets omitted).  Whether deference is due an agency's litigating position is "likely to turn on factors such as the consistency of its position and its application of that position through administrative practice than on the quality of its court advocacy." *Price*, 697 F.3d at 832 n.8.

### iii.    *Auer* Deference

Finally, when an agency interprets its own regulations, that interpretation "is entitled to substantial deference." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 149 (1991) (internal quotation marks omitted).  "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable [and] the interpretation sensibly conforms to the purpose and wording of the regulations." *Id.* (citations, brackets, and internal quotation marks omitted).  Such deference is usually warranted "even when that interpretation is advanced in a legal brief." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).  However,

"*Auer* deference is not warranted in *all* circumstances." *Vietnam Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1078 (9th Cir. 2016) (emphasis added).

> Deference is undoubtedly inappropriate, for example, when the agency's interpretation is plainly erroneous or inconsistent with the regulation. And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack.

*Christopher*, 132 S. Ct. at 2166 (citations, brackets, and internal quotation marks omitted).

**B.    Analysis**

CIGA does not dispute that each charge for which CMS sought reimbursement contained at least one diagnosis code that is covered by CIGA's policies, and Defendants do not dispute that each charge also contained codes that were *not* covered by those policies.  (Defs.' SUF 9, 10; Pl.'s SUF 6–7, 15–16, 25–26.)  Thus, the parties' arguments center on two main issues: (1) whether CIGA made a *prima facie* case to CMS that the reimbursement requests were erroneous; and (2) whether the MSP and the implementing regulations support Defendants' position that CIGA must always fully reimburse CMS for a charge containing one covered code regardless of whatever uncovered codes are also present.

**1.    Burden**

The parties agree that Medicare reimbursement disputes are subject to a burden-shifting analysis.  That is, CIGA "ha[s] the initial burden of making a *prima facie* case that Medicare's reimbursement request were overinclusive."  *Estate of Urso v. Thompson*, 309 F. Supp. 2d 253, 260 (D. Conn. 2004).  If CIGA meets this burden, the burden shifts to CMS to justify its reimbursement requests.  *Id.*; *see also Wall v. Leavitt*, No. CIV S05-2553FCDGGH, 2008 WL 4737164, at *15 (E.D. Cal. Oct. 29,

2008) (following *Urso*); *Weinstein v. Sebelius*, No. CIV.A. 12-154, 2013 WL 1187052, at *6 (E.D. Pa. Feb. 13, 2013) (same); *Young v. Sec'y of Health & Human Servs.*, No. 4:11CV002-B-A, 2012 WL 379510, at *4 (N.D. Miss. Feb. 3, 2012) (same).

Defendants argue that CIGA failed to make a *prima facie* case to CMS that it was not responsible for the disputed payments. (Defs.' Mot. at 9–10, ECF No. 63.) The Court disagrees. CMS sent conditional payment letters to CIGA identifying the charges for which it believed CIGA was responsible. For two of the three demands at issue, CIGA disputed its liability for the charges on several grounds—including that they contained diagnosis codes that were not covered by the underlying workers' compensation policies. (Azaran Decl., Exs. C, E, G, ECF No. 68-4.) CIGA included a list of such codes for one of the claims, and has since identified additional uncovered codes for each of the three claims. (Azaran Decl., Ex. G; Young Decl. ¶ 3, Ex. A, ECF No. 68-3; SAC ¶¶ 46, 50, 52.)[7] Defendants contend that simply providing a list of purportedly uncovered diagnosis codes is insufficient because this does not prove that the codes were in fact uncovered, and that it in any event does not show how the inclusion of uncovered codes renders CMS's reimbursement demands over-inclusive (or by how much). (*See* Defs.' Mot. at 9–10, ECF No. 63; Defs.' Reply at 2–5, ECF No. 78; Defs.' Opp'n at 4–6, ECF No. 76.) Given the scope of CIGA's argument, however, identifying the unrelated codes is sufficient. Whether or not the listed codes were covered by CIGA's policies has never been in dispute—with only a few exceptions, all parties have always agreed that they are not. (*See* Pl.'s SUF 6–30, 58–60, 62–65.) Rather, as Defendants concede, CMS sought full reimbursement for the disputed charges because it is CMS's practice to "seek full reimbursement for a conditional payment as long as one diagnosis code was related." (Defs.' Reply at 4.) To the extent CIGA is only challenging this blanket practice, it is sufficient that CIGA

---

[7] While Defendants argue that CIGA's interrogatory responses and employee declarations do not show that it has met its burden, Defendants do not appear to argue that such evidence cannot be considered for this purpose. Thus, the Court only assumes, without deciding, that this is the case.

identified diagnosis codes that everyone agrees is plainly unrelated to any medical conditions that the workers' compensation policies cover.

### 2. Validity of CMS's Practice

Under the MSP, "a primary plan . . . shall reimburse [Medicare] for any payment made . . . with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii). The critical phrase—"item or service"—is defined by regulation, which reads in relevant part: "Any item, device, medical supply or service provided to a patient (i) which is listed in an itemized claim for program payment or a request for payment . . . ." 42 C.F.R. § 1003.101. Defendants appear to argue that the term "an item or service" refers to whatever (and however many) medical treatment(s) a provider lumps into a single charge, and that CIGA has a "responsibility to make payment with respect to such item or service" if the provider lists one or more diagnosis code(s) that are covered by the CIGA-administered policy. Defendants are wrong on both counts.

### i. Definition of "Item or Service"

The statutory phrase "an item or service" clearly does not refer to multiple medical treatments just because they appear under one charge. The singular form of the words "item" and "service" itself suggests that those words are not referring to multiple medical treatments. Moreover, the use of the phrase "item or service" elsewhere in the MSP does not support Defendants' interpretation. *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014) ("One ordinarily assumes 'that identical words used in different parts of the same act are intended to have the same meaning.'" (citation omitted)). For example, the MSP describes an individual "submit[ting] *a* claim for payment for item*s* and service*s*," 42 U.S.C. § 1395y(e)(2) (emphases added), thus suggesting that a single claim for payment can contain multiple "items" or "services." Similarly, the MSP also describes the situation in which "*a* payment" is made by CMS "for item*s* and service*s* provided to the

claimant," *id.* § 1395y(b)(2)(B)(vii)(1), which makes clear that a single payment (which Defendants appear to assume always corresponds to a single charge) can be made for multiple items or services.  Defendants do not point to anything suggesting that Congress intended the definition of "item or service" to depend in any way on the manner in which a provider bills for them.  It thus seems clear that one "item or service" refers to only *one* medical treatment, regardless of how it is billed.

To the extent any ambiguity remains in the statute, the regulation defining "item or service" actually detracts from Defendants' interpretation.  That regulation defines a singular "item or service" as "[a]ny item, device, medical supply or service provided to a patient . . . which is listed in an itemized claim for program payment or a request for payment."  42 C.F.R. § 1003.101.  Notably, the terms "item, device, medical supply or service" are also in the singular form.  If the agency contemplated multiple medical treatments to potentially qualify as one "item or service," it should have (at the very least) used the plural form of these words.  And despite Defendants' suggestion otherwise, the fact that an "item or service" must be "listed in an itemized claim for program payment" does not compel a different result.  Just because an item or service must be listed in a claim for payment does not mean that their character as either a single or multiple "item or service" depends on *how* they are listed.

## ii.   CIGA's "Responsibility to Make Payment" for the Item or Service

The Court is also unconvinced that CIGA has a "responsibility to make payment" for a treatment not covered by its policy just because that treatment is lumped together with other covered treatments on a line-item charge.  Whether a compensation carrier has a "responsibility to make payment" with respect to an item or service is generally a matter of state law.  *See* 42 U.S.C. § 1395y(b)(2)(A)(ii); *Caldera v. Ins. Co. of the State of Pa.*, 716 F.3d 861, 863–65 (5th Cir. 2013).  California law is clear that where a patient receives multiple treatments for multiple conditions, the compensation carrier is not responsible for the treatments that are not

attributable to an industrial accident—at least to the extent they are separable from the treatments that are so attributable. *See S. Coast Framing, Inc. v. W.C.A.B.*, 61 Cal. 4th 291, 297 (2015) ("It has long been settled" that a compensation carrier must pay benefits only for "an injury [that] 'arise[s] out of the employment,'" which means that the injury "must 'occur by reason of a condition or incident of [the] employment'"); *Granado v. Workmen's Comp. App. Bd.*, 69 Cal. 2d 399, 405 (1968) ("Medical treatment unrelated to the industrial injury need not be furnished by the employer."); *Indus. Indem. Co. v. Indus. Acc. Comm'n*, 103 Cal. App. 2d 249, 250 (1951) ("It is clear from these provisions that the award of compensation for medical treatment can only be made where the necessity for such treatment results from an injury incurred in the employment.").

Defendants point to several cases holding that a workers' compensation carrier cannot seek to apportion the cost of a single medical treatment just because that treatment is also used to cure an uncovered condition. *See Granado*, 69 Cal. 2d at 405–06 ("So long as the treatment is reasonably required to cure or relieve from the effects of the industrial injury, the employer is required to provide the treatment, and treatment for nonindustrial conditions may be required of the employer where it becomes essential in curing or relieving from the effects of the industrial injury itself."); *Rouseyrol v. Workers' Comp. App. Bd.*, 234 Cal. App. 3d 1476, 1485 (1991) (an employer cannot "apportion[] the entire need for [medical] care to nonindustrial causes on the theory that, despite industrial contribution to the need for attendant care, natural progression of a preexisting disease would have resulted in a need for the same level of care at the present time even if there had been no industrial injury"). However, this says nothing about apportioning a charge that represents the cost of *multiple* medical treatments.[8]

---

[8] There may be a factual dispute as to whether each contested charge represents one medical treatment or if there are some that represent two or more treatments. Nevertheless, this does not preclude summary judgment. Defendants have made clear that CMS's practice is to seek full reimbursement for a charge that contains one or more covered diagnosis codes, regardless of

Defendants also argue that even if state law allows for apportionment, it is preempted by the MSP. However, Defendants do not show that the MSP even requires anything different. Assuming that "an item or service" could be construed as potentially referring to multiple medical treatments, the MSP does not make CIGA's obligation to pay for that "item or service" an all-or-nothing proposition. For example, the MSP describes CMS's ability to bring a direct action for reimbursement against entities "that are or were required or responsible . . . to make payment with respect to the same item or service (*or any portion thereof*) under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iii) (emphasis added); *see also id.* § 1395y(b)(2)(B)(vi) (describing "entit[ies] required or responsible under this subsection to pay with respect to the item or service (or any portion thereof) under a primary plan . . ."). The MSP therefore contemplates that a primary plan could be "responsible" for paying only a "portion" of an "item or service." *Id.* Defendants do not point to anything in the MSP showing that CIGA must reimburse CMS for more than what CIGA is otherwise "responsible" for paying.

### iii.   Deference

Defendants argue at length that the Court must defer to their interpretation of the MSP and the relevant regulations. The Court again disagrees. First, Defendants' brief is not entitled to *Chevron* deference to the extent it attempts to interpret the MSP directly. *Andersen*, 766 F.3d at 1212. Second, the relevant regulation (42 C.F.R. § 1003.101) actually supports CIGA's interpretation of the MSP, and thus any deference to it would not help Defendants. Third, Defendants' interpretation of § 1003.101 is not entitled to *Auer* deference both because it "conflicts with" CMS's MSP Manual, and because it appears to be just "a *post hoc* rationalization seeking to defend past agency action against attack." *Christopher*, 132 S. Ct. at 2166. The MSP

---

anything else, and that they applied this practice to calculating the reimbursement demands here. Thus, Defendants acted contrary to law.

17

1   Manual provides:

2       If WC does not pay all of the charges because only a portion of the
3       services is compensable, i.e., the patient received services for a condition
        which was not work related concurrently with services which were work
4       related, Medicare benefits may be paid to the extent that the services are
5       not covered by any other source which is primary to Medicare.

6   (Pl.'s SUF 55.)

7       Defendants argue that this provision relates only to conditional payments for

8   which CMS can always seek reimbursement rather than payments for which

9   reimbursement is not expected (or required) from the compensation carrier.  However,

10  the Court is not convinced that this provision is wholly unrelated to reimbursement.

11  Where a doctor furnishes services to a patient "for a condition which was not work

12  related," a workers' compensation carrier has no obligation to pay for that service or

13  to reimburse CMS for that service.  (*See supra*.)  Thus, by stating that "Medicare

14  benefits may be paid" in the event that the charges are not covered by either workers'

15  compensation or "any other source which is primary to Medicare," the manual is not

16  simply stating that a reimbursable conditional payment may made, because the built-in

17  assumption here is that there is no primary payer that can reimburse CMS for that

18  payment.  Accordingly, this provision contemplates the payment of benefits *without*

19  *reimbursement* "for a condition which was not work related" when furnished

20  "concurrently with services which were work related."

21      The relevance of this provision to reimbursement is buttressed by the testimony

22  of Ian Fraser, who is a health insurance specialist employed by CMS.  When asked in

23  deposition about the effect of this provision on CMS's reimbursement procedures,

24  Fraser remarked that he found this provision "difficult" because it was either

25  impractical or impossible to split a single charge containing "both work related

26  services and nonwork related services."  (Fraser Depo. at 36–38, ECF No. 68-1.)

27  However, he testified that he did not disagree "with the actual substance of that

28  [provision]."  (*Id.*)  Fraser thus tacitly acknowledged that this provision not only

relates to reimbursement but that it requires something other than what CMS actually does with respect to calculating reimbursements for single charges. Defendants cannot wiggle out of this testimony by submitting a subsequent declaration from Fraser stating that this provision simply relates to conditional payments and not reimbursement, which contradicts his deposition testimony.[9] At bottom, it is quite clear that the real reason CMS calculates reimbursement demands in the manner that it does is simply because it is too difficult to do otherwise, not because that is what is required (or even permitted) by any statute, regulation, or policy manual. For these reasons, the Court declines to give *Auer* deference to Defendants' interpretation of the implementing regulations.[10]

On a final note, the Court wishes to emphasize the limits of its decision. The Court simply holds that if a single charge contains multiple diagnosis codes—some of which relate to a medical condition covered by CIGA's policy and some of which do not—the presence of one covered code does not *ipso facto* make CIGA responsible for reimbursing the full amount of the charge. Instead, CMS must consider whether the charge can reasonably be apportioned between covered and uncovered codes or treatments. Upon such consideration, CMS might still conclude that apportioning the charge is unreasonable. In addition, even if the charge should be apportioned, the Court takes no position on *how* CMS should do so (e.g., pro-rata by covered codes versus uncovered codes, or some other method).

/ / /

---

[9] Defendants also suggest that Fraser was essentially tricked in his deposition into believing that this provision concerned reimbursement. After reviewing the context of the questioning, the Court sees no trickery here. Defendants do not explain how a health insurance specialist who has worked in CMS's MSP unit for 13 years would not have had a thorough understanding of what portions of the MSP Manual applied to reimbursements versus benefit coordination, and thus be able to point out during his deposition that the provision put in front of him had nothing to do with reimbursements.

[10] For the same reason, the Court declines to give *Skidmore* deference to Defendants' interpretation of the MSP. *Price*, 697 F.3d at 832 n.8 (*Skidmore* deference usually turns in part on "the consistency of [the agency's] position").

## C.    Injunctive Relief

Defendants contend that even if CMS's practice is arbitrary and capricious, CIGA is not entitled to injunctive relief barring CMS from applying the practice for future claims because: (1) CIGA did not adequately plead the specific type of injunctive relief it now seeks; (2) such relief would constitute an end-run around the mandatory administrative appeals process for future reimbursement disputes; and (3) it would constitutes an impermissible "programmatic attack" against a federal agency. None of these reasons show that CIGA is not entitled to injunctive relief.[11]

### 1.    Sufficiency of the Pleadings

In both its FAC and SAC, CIGA prayed for "an order permanently enjoining Defendants . . . from enforcing the MSP provisions against CIGA with respect to government claims for reimbursement that are not 'covered claims.'"  (FAC, Prayer for Relief ¶ 4; SAC, Prayer for Relief ¶ 4.)  Defendants argue that this prayer for relief pertains only to legal theories that the Court previously dismissed.  Indeed, CIGA sought leave to file a Third Amended Complaint to add a specific request to enjoin Medicare from seeking reimbursement for "charges . . . that are not covered by the workers compensation insurance policy of any insolvent insurer," suggesting that even CIGA recognized that the SAC's prayer for relief did not relate to the one theory still left before the Court.  While the question is close, the Court concludes that CIGA is not precluded from seeking their request injunction.

"Every . . . final judgment [not obtained by default] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c).  Rule 54(c) is "liberally construed," and thus the court should usually "grant whatever relief is appropriate in the case on the facts

---

[11] The parties have not addressed, and thus the Court does not decide, whether injunctive relief is otherwise appropriate under the traditional four-factor test.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (applying equitable test to a permanent injunction against an administrative agency).

proved"—"includ[ing] injunctive relief when appropriate, and even when not specifically requested." *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986) (citations and internal quotation marks omitted). That said, a party may nevertheless not be "entitled" to relief "if its conduct of the cause has improperly and substantially prejudiced the other party." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424–25 (1975). A party may be "prejudiced" if the court "grants relief not requested and of which the opposing party has no notice." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 86 (2d Cir. 2004); *see also Felce v. Fiedler*, 974 F.2d 1484, 1501–02 (7th Cir. 1992). This appears to be a narrow exception, however, for the Ninth Circuit has liberally construed what constitutes sufficient notice of the requested relief. *Compare Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (plaintiff was entitled to the injunctive relief the district court awarded because it was only slightly different from the injunction prayed for in the complaint, and because plaintiff brought to the district court's attention the possibility of seeking a different injunction), *with Seven Words LLC v. Network Sols.*, 260 F.3d 1089, 1098 (9th Cir. 2001) (defendant was prejudiced by plaintiff's request for damages where it "was made after two years of litigation, after various representations that it was seeking only declaratory and injunctive relief, after a motion to dismiss, and at the eleventh hour, only days before oral argument on appeal").

Here, CIGA gave sufficient notice to Defendants that it sought to enjoin CMS from seeking full reimbursement for charges containing uncovered diagnosis codes. In its FAC, CIGA alleged multiple reasons why CMS's request for reimbursement did not constitute a statutorily-defined "covered claim," including because the payments did not fall "within the coverage of an insurance policy of the insolvent insurer," Cal. Ins. Code § 1063.1(c)(1)(A). (FAC ¶ 32.) CIGA broadly requested "an order permanently enjoining Defendants . . . from enforcing the MSP provisions against CIGA with respect to government claims for reimbursement that are not 'covered

claims.'"   (FAC, Prayer for Relief ¶ 4.)   CIGA similarly alleged in its SAC that it could "only pay 'covered claims' that are 'within the coverage of an insurance policy of the insolvent insurer,'" and that "Defendants seek to recover many 'conditional' payments from CIGA that are outside the coverage of the insolvent insurer's policy . . . ."   (SAC ¶ 44.)   CIGA also reasserted the identical request for injunctive relief present in the FAC.   While the Court has since dismissed CIGA's *other* legal theories as to why CMS's reimbursement requests were not "covered claims," it is quite clear that the request for injunctive relief still applies to the lone remaining theory.

To be fair, CIGA caused a fair amount of confusion when it sought to add a *further* prayer for injunctive relief that would bar CMS from seeking reimbursement from CIGA specifically for "charges . . . that are not covered by the workers compensation insurance policy of any insolvent insurer."   (ECF No. 55.)   Moreover, as the Court denied leave to add such a request, Defendants could have reasonably assumed that such relief was now off the table.   Nevertheless, it appears that Defendants made no such assumption.   For example, in their motion for summary judgment, Defendants still attacked the Court's ability to issue this precise injunction under the APA.   (Defs.' MSJ at 15 n.5.)   In addition, the injunction was always the focus of (and sticking point in) the parties' settlement discussions.   (Joint Report at 5; MSJ Hr'g Tr. at 12.)   In fact, Defendants took the position that CIGA did not put them on notice of the contemplated injunction only after the Court requested briefing on that issue.[12]   Given the Ninth Circuit's liberal approach to Rule 54(c), the Court is satisfied that Defendants were sufficiently on notice of the specific injunction CIGA now seeks, and thus would not be prejudiced if the Court granted that relief.

---

[12] In granting Defendants' request to move to dismiss the action as moot, the Court requested briefing on the question "[w]hether CIGA sufficiently pleaded in its Second Amended Complaint its request that the Court enjoin Defendants from seeking reimbursement for Medicare payments that are not covered by the policies that CIGA administers," and noted that "[i]t appears to the Court that the injunctive relief CIGA has requested in its paragraph 4 of its prayer for relief relates only to legal theories that the Court has already dismissed."   (Minute Order at 1–2. ECF No. 84.)

## 2.     Mandatory Appeals Process

Shortly after CIGA filed suit, CMS created an administrative appeals process that every disputed reimbursement demand must go through before judicial review. *See* 42 U.S.C. § 1395y(b)(2)(B)(viii); 80 Fed. Reg. 10,611-01; 42 U.S.C. § 405(g); *id.* § 405(h) ("No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under            section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.").  Defendants argue that dictating how CMS must calculate future reimbursement demands effectively bypasses the mandatory appeals process with respect to those demands.

The problem with Defendants' argument is that it impermissibly separates CIGA's injunctive relief claim from its substantive legal claim.  The Supreme Court has made clear that § 405(h)'s prohibition on pre-exhaustion judicial review does not turn on "the 'potential future' versus the 'actual present' nature of the claim, the 'general legal' versus the 'fact-specific' nature of the challenge, the 'collateral' versus 'noncollateral' nature of the issues, *or the 'declaratory' versus 'injunctive' nature of the relief sought.*"  *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13–14 (2000) (emphasis added) (citations omitted).  Rather, § 405(h) simply requires the substantive question over the legality of CIGA's practice to be properly before the Court for adjudication—which Defendants do not dispute.  *Id.*  Indeed, the purpose of the exhaustion requirement is simply to give the agency a chance to consider the legal questions presented by the dispute before an Article III court considers them.  *Id.* at 13.  Once this happens, it is ripe for adjudication (and remediation) by the court; there is no reason to give the agency a chance to revisit the same legal issue in *every single* future reimbursement dispute on the off chance that the agency changes its mind somewhere down the line.  Nor should the exhaustion requirement be used as a pretext for a policy of "nonacquiesence" to unfavorable judicial interpretations of statutes and

1  regulations.  *Cf. N.L.R.B. v. Ashkenazy Prop. Mgmt. Corp.*, 817 F.2d 74, 75 (9th Cir.

2  1987).

3        **3.**      **Broad Programmatic Attack**

4        Finally, Defendants contend that CIGA is impermissibly attempting to institute

5  wholesale change to the Medicare reimbursement program.  "The Supreme Court has

6  made clear that the APA does not allow 'programmatic' challenges to agency . . .

7  procedures, but instead requires that there be a specific final agency action which has

8  an actual or immediate threatened effect."  *High Sierra Hikers Ass'n v. Blackwell*, 390

9  F.3d 630, 639 (9th Cir. 2004).  For example, in *Lujan v. National Wildlife Federation*,

10  the plaintiff alleged that a land management program implemented by the Bureau of

11  Land Management was "rampant" with legal violations.  497 U.S. 871, 890 (1990).

12  The Supreme Court nonetheless held that "respondent cannot seek *wholesale*

13  improvement of this program by court decree, rather than in the offices of the

14  Department or the halls of Congress, where programmatic improvements are normally

15  made."  *Id.* at 891 (original emphasis).  Rather, judicial review must wait until "the

16  scope of the controversy has been reduced to more manageable proportions, and its

17  factual components fleshed out, by some concrete action applying the regulation to the

18  claimant's situation in a fashion that harms or threatens to harm him."  *Id.*  Moreover,

19  even where the plaintiff identifies specific agency actions in an administrative

20  program that are allegedly unlawful, the plaintiff cannot use those specific actions in

21  order to challenge the entire program.  *See High Sierra Hikers*, 390 F.3d at 639;

22  *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 553–54 (9th Cir.

23  2009); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801–02 (9th Cir. 2013).

24        CIGA is not pushing for the kind of wholesale change to an entire federal

25  program that the plaintiffs in *Lujan* were.  CIGA does not seek across-the-board

26  changes to the manner in which Medicare functions; it is attacking one discrete

27  practice that CMS both applied to the three reimbursement demands at issue here

28  (each of which Defendants concede constitutes final agency action) and has made

clear that it intends to apply to future reimbursement demands by CIGA.  This clearly constitutes "concrete action [that] appl[ies] the regulation to the claimant's situation," as required by *Lujan*.  497 U.S. at 890.  The Ninth Circuit has found challenges to comparably discrete agency conduct permissible.  *High Sierra Hikers*, 390 F.3d at 639 ("High Sierra has alleged specific discrete agency actions taken by the Forest Service that have caused harm.  High Sierra did not challenge the entirety of the wilderness plan, but instead challenged certain agency actions [within the larger plan], for example the grant of certain special-use permits, and the calculation of certain trailhead limits."); *Siskiyou Reg'l Educ. Project*, 565 F.3d  553–54 ("SREP has expressed more than a generalized dissatisfaction with the Forest Service's decision to limit the application of MM–1 . . . .  SREP's complaint refers to specific instances of suction dredge mining operations that took place without an approved plan of operations in waterways administered by the Forest Service. . . . SREP's allegations challenge specific instances of the Forest Service's actions taken pursuant to its interpretation of MM–1, and therefore constitute more than a programmatic attack or a vague reference to Forest Service action or inaction.").  Moreover, the practice that CIGA challenges fairly constitutes "agency action," which is reviewable on review of the final agency action.  5 U.S.C. § 704; *see also id.* § 551(13) (defining "agency action" as "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"); *id.* § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); Fraser Depo. at 34 ("Q. [D]o you know why is that part of the protocol or procedure that that approach is generally taken?  A. That's always been the way that we've done it.  Q. Has anyone instructed you to do it that way?  A. It's just for – for what we do that's just been what we've always done.").

/ / /

# V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motion to Dismiss (ECF No. 87), **DENIES** Defendants' Motion for Summary Judgment (ECF No. 63), and **GRANTS** CIGA's Motion for Partial Summary Judgment (ECF No. 68). The Court **VACATES** all future dates and deadlines in this action, including the trial date.  Within two weeks of the date of this order, the parties should submit a proposed schedule for adjudicating all remaining disputes in this action.  Alternatively, if no further disputes remain, the parties should submit a proposed judgment to the Court.

**IT IS SO ORDERED.**

January 5, 2017

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**